# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**

**ROBERT M. CAO,**

**Defendant.**

Case: 1:21−mj−00598
Assigned To : Meriweather, Robin M.
Assign. Date : 9/12/2021
Description: Complaint w/ Arrest Warrant

**FILED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jesse A. Dodson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since November 2012.  I am currently assigned to a health care fraud squad at the FBI's Washington Field Office.  My duties include, but are not limited to, investigations of health care fraud, money laundering, and false claims in the Washington, D.C., metropolitan area.  Prior to becoming a Special Agent with the FBI, I worked full time as a licensed Physician Assistant. 8 I have been a licensed and certified Physician Assistant since 2006 and was an Emergency Medical Technician for seven years prior to earning a Master of Medical Science at Emory School of Medicine in Atlanta, Georgia.  I still practice as a part-time Physician Assistant at Fort Belvoir Community Hospital Emergency Department.  I have also served in the military for twenty-three years and currently hold the rank of Lieutenant Colonel.  I also serve in the District of Columbia Army National Guard as the Deputy Commander for the Medical Command.

2.      As a Special Agent with the FBI, I have received training in the enforcement of the laws of the United States, including training in the preparation, presentation, service, and execution

of criminal complaints and arrest and search warrants.  As part of this training, I completed a twenty-week training program at the FBI Academy, which included instruction in the investigation of various criminal offenses governed by federal law.  I have also received advanced training in matters relating to criminal investigations.  As a Special Agent, I have assisted and/or participated in the preparation and/or execution of multiple search and arrest warrants.  As a federal agent, I am an investigative or law enforcement officer of the United States within the meaning of Title 18 of the United States Code who is empowered by law to conduct investigations of and to make arrests for federal criminal offenses, including offenses enumerated in Title 18, Title 21, and Title 42.  I am one of the FBI case agents assigned to this investigation.

3.      The facts set forth below are based upon my own observations, investigative reports, records, and information provided to me by other law enforcement officers and people with knowledge of the case.  This affidavit does not represent every fact that law enforcement knows about this investigation.  Rather, it is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint against Dr. Robert M. Cao ("CAO"), a physician who is licensed to practice medicine in the District of Columbia and Virginia, for violations of the laws of the United States, that is, unlawful distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).  As detailed below, between in or around at least January 9, 2021, and continuing through in or around May 30, 2021, including on or about May 23, 2021, while acting and intending to act outside the usual course of his professional practice and without a legitimate medical purpose, CAO knowingly and intentionally distributed oxycodone and hydrocodone, Schedule II controlled substances.

## BACKGROUND

### *The Controlled Substances Act*

4.      Under Title 21 of the Controlled Substances Act ("CSA"), the United States Drug Enforcement Agency ("DEA") classifies drugs, substances, and certain chemicals into five distinct categories or schedules depending upon the drug's acceptable medical use and the drug's abuse or dependency potential.  Schedule II controlled substances have a currently accepted medical use in the United States, or a currently accepted medical use with severe restrictions, as these substances also have a high potential for abuse, which may lead to severe psychological or physical dependence.  *See* 21 U.S.C. § 812(b)(2).  For example, and relevant to the present investigation, the narcotic analgesic oxycodone/acetaminophen is regulated by the DEA under the CSA as a Schedule II narcotic, and often sold under the brand names Percocet, Endocet, or Tylox, as well as in generic form.  Likewise, the narcotic analgesic hydrocodone/acetaminophen is regulated by the DEA under the CSA as a Schedule II narcotic, and often sold under the brand names Vicodin, Norco, and Lortab, as well as in generic form.

5.      Certain licensed providers are permitted to prescribe controlled substances, pursuant to practices and procedures consistent with the applicable standard of care.  For example, there must be a legitimate doctor-patient relationship, a proper and thorough medical examination of the patient and conducting of diagnostic tests before prescribing any controlled substance.  It is also important that, before prescribing any controlled substance, the licensed medical provider ascertain whether a patient is taking any other types of medications or controlled substances.  As part of the standard of care, a provider should also consider, discuss, and document the medical purpose of providing the controlled substance, the potential side effects of the controlled substance being prescribed, and any dangers associated with that controlled substance.

3

6.      Licensed providers are also expected to document patient examinations and visits and maintain treatment records in connection with same.  According to D.C. Municipal Regulation 17, § 4612.1, medical doctors practicing in the District of Columbia are required to maintain adult medical records for a minimum of three years after last seeing the patient.  According to Virginia Administrative Code Title 18, § 85-20-26(D), medical doctors practicing in the Commonwealth of Virginia are required to maintain adult medical records for a minimum of six years after the last patient encounter.

*Prescription Monitoring Programs*

7.      Prescription drugs are monitored through online databases maintained by almost every state and the District of Columbia.  Specifically, these databases maintain a record of all controlled substance prescriptions that have been written and filled at a pharmacy within the state. These databases are utilized by law enforcement agencies to assist investigations.  Pharmacies are required to input data into the relevant system about the patient, prescribing physician, pharmacy that filled the prescription and the details of the controlled substances prescribed.

8.      The Commonwealth of Virginia has a Prescription Monitoring Program (hereinafter, the "PMP") run by the Virginia Department of Health Professionals.  Virginia's PMP is a 24/7 database containing information on dispensed controlled substances included in Schedule II, III, and IV of the CSA; those in Schedule V for which a prescription is required; naloxone, all drugs of concern, and cannabidiol oil or THC-A oil dispensed by a pharmaceutical processor in Virginia.  The primary purpose of the PMP is to promote safe prescribing and dispensing practices for covered substances by providing timely and essential information to healthcare providers. Additionally, law enforcement and health profession licensing boards use the PMP to support investigations related to doctor shopping, drug diversion, and inappropriate prescribing and

4

dispensing.  Users of the PMP can run Prescriber Activity Reports by a prescriber's unique DEA number, showing the prescriptions, patients and pharmacies associated with a prescriber's activity. The reports show the names, dates of birth, fill dates, written dates, drug names, quantity, supply, store identification, prescription number and payment type associated with each prescription filled by patients of the prescriber.

9.      Similarly, the District of Columbia also has a Prescription Drug Monitoring Program (hereinafter, the "PDMP") run by the District of Columbia Department of Health.  The PDMP aims to improve the District's ability to identify and reduce diversion of prescription drugs. The PDMP also aims to enhance patient care by providing prescription monitoring information that will assure legitimate use of controlled substances in health care.  Users of the PDMP can run Prescriber Activity Reports by a prescriber's unique DEA number, showing the prescriptions, patients and pharmacies associated with a prescriber's activity.  The reports show the names, dates of birth, fill dates, written dates, drug names, quantity, supply, store identification, prescription number and payment type associated with each prescription filled by patients of the prescriber.

## **PROBABLE CAUSE**

### ***Background Regarding Suspicious Death of V.C.***

10.      On or about May 31, 2021, first responders, including Fairfax County Police Department ("FCPD") officers, were dispatched to a Fairfax, Virginia residence in response to a 911 call for assistance regarding victim "V.C.," after his girlfriend found him cold and non-responsive.  Upon first responders' arrival at the residence, V.C. was pronounced deceased under suspicious circumstances.  Law enforcement interviewed V.C.'s girlfriend, who made the initial call for assistance.  She reported that V.C. had returned to the residence seemingly intoxicated at

approximately 11:00 p.m. the prior evening, and that V.C. took Percocet at some point prior to going to bed at approximately 5:30 a.m.

11.     On the nightstand next to where V.C. was found deceased were multiple prescription bottles, including one containing 10.5 of 30 Percocet pills filled on May 23, 2021. CAO, a doctor who is licensed to practice in the District of Columbia and Virginia, was the prescribing doctor listed on the Percocet bottle.  A subsequent autopsy report completed by the Office of the Chief Medical Examiner for the Northern Virginia District of the Commonwealth of Virginia Department of Health documented the cause of death as acute combined oxycodone and ethanol poisoning.  V.C.'s toxicology screen was also positive for oxycodone, oxymorphone, and ethanol.  Percocet is a brand name of the narcotic analgesic oxycodone/acetaminophen, regulated by the DEA under the CSA as a Schedule II narcotic.

### *Follow-Up Investigation*

12.     In or around July 2021, the FBI opened an investigation into CAO after being contacted by FCPD in connection with V.C.'s death.  As a licensed medical doctor who held DEA registration number FC8146094, CAO was authorized to dispense to patients Schedule II through Schedule V controlled substances and to prescribe medicine, including controlled substances, to patients only for legitimate medical purposes and in the usual course of his professional practice.

13.     Law enforcement obtained Virginia PMP data, which indicated that V.C. used a health insurance plan for the purchase and filling of narcotic prescriptions from CAO at various pharmacies in Virginia and the District of Columbia.  Law enforcement also obtained copies of the paper prescriptions CAO wrote for V.C. from the relevant pharmacies.  Each prescription appeared to be signed by CAO and handwritten on a pad from a District of Columbia cosmetic medical office ("Medical Office 1") where CAO had previously worked.  Based on my training

6

and experience, I know that the use of paper prescriptions by CAO raises a red flag since many states have transitioned to the use of electronic prescriptions for controlled substances in an effort to reduce drug diversion.  For example, Virginia Code § 54.1-3408.02 mandates that any prescription for a controlled substance that contains an opioid shall be issued as an electronic prescription, with limited exceptions.  Furthermore, based on my training and experience, I know that paper prescriptions often present greater risk of misuse than electronic prescribing of controlled substances ("EPCS") because of susceptibility to forgery.  Electronic prescriptions are typically created from drop-down menus, which prevent or reduce the likelihood of misspelled drug names, inappropriate or missing dosage forms and units, and other indicators of possible forgery.  Many pharmacy applications have audit trail functions for electronic prescriptions, whereas paper prescriptions are typically verified by a call from the pharmacy to the listed prescriber's office.  Furthermore, as detailed below, the investigation revealed multiple other "red flags" demonstrating conduct by CAO that was outside the usual course of professional practice.

### *Review of Subscriber Information and Electronic Communications*

14.     As part of the investigation, law enforcement obtained messages extracted from V.C.'s Apple iPhone, which was assigned the phone number ending in -6316.  A review of these messages revealed several texts exchanged between V.C. and CAO from in or around December 27, 2020, through in or around May 30, 2021.  Cellphone subscriber records obtained by law enforcement confirmed that during the relevant period, the phone number ending in -9256 was registered to CAO.

15.     A review of the text exchanges between CAO and V.C. identified discussions about CAO prescribing narcotic pain medications to V.C. that were filled at pharmacies in the District of Columbia and elsewhere during the months prior to V.C.'s death, including on May 23, 2021

and May 30, 2021.  The text messages also showed a relationship between CAO and V.C. regarding kickbacks of narcotic pain pills.  Specifically, they indicated that CAO wrote V.C. prescriptions for controlled substances in exchange for receiving a portion of the pills obtained via the prescriptions.  Notably absent from the messages was any indicia of a professional doctor patient relationship between CAO and V.C., of a proper medical evaluation or treatment plan, of any analysis of medical necessity with regard to the prescribing of multiple narcotic pain medications, or of any documentation relating to this.  Based on my training and experience, I know that these things are all part of a legitimate doctor-patient relationship.

16.      ***CAO initiates pain medication discussions.***  In multiple text exchanges, CAO appeared to initiate the discussion regarding opioid prescriptions.  For example, on December 27, 2020, CAO sent a text to V.C. stating, in part "Hey [V.C.]. Wanted to see if you still "need" meds lol," to which V.C. responded "Haha yeah man! I Def need some good meds."  Likewise, on January 8, 2021, CAO sent a text to V.C. stating "Let me know if you want the script from me for Sunday :)"  On January 17, 2021, CAO sent another text to V.C. stating, in relevant part, "Let me know if you're able to get the norco's."[1]  On March 19, 2021, CAO sent a text to V.C. stating "The script is at my apt in Falls Church. Want me to pick up the script and come see you? Or should I see you before you leave the office and get you the script later?" to which V.C. responded "Hmm. I'm dying for some perc haha. I'll stick around the office for a bit."[2]  Once again, on May 11, 2021, after learning that V.C. had been involved in a minor car accident, CAO raised the issue of

---

[1] Based on my training and experience, I know the term "norcos" is known to be a reference to Norco, a brand name of the narcotic analgesic hydrocodone/acetaminophen regulated by the DEA under the CSA as a Schedule II narcotic.

[2] Based on my training and experience, I know the word "perc" or "percs" is known to be an abbreviation or street name for Percocet, a brand name of the narcotic analgesic oxycodone/acetaminophen, regulated by the DEA under the CSA as a Schedule II narcotic.

prescription pain pills, texting "Does that mean you get more pain meds?"  V.C. responded "Lololol I could Def use some," to which CAO quickly replied, "sounds good."

17.    ***CAO and V.C. agree to split the pills obtained via CAO's prescriptions.***  A review of the messages also revealed that CAO proposed a plan in which V.C. and CAO would split any pills that V.C. obtained via the prescriptions CAO wrote him.  For example, on December 27, 2020, CAO texted V.C. suggesting, "I know you're a percs fan. I'm a norcos fan myself. We can do 50/50 each or you can keep all the percs and I can keep all the norcos," to which V.C. responded, "Hell yes…I'm totally down."  CAO then responded "Cool.  We'll start by doing a script one Sunday and a script another Sunday and just go from there :)"  Likewise, on January 10, 2021, V.C. texted CAO to let him know he "[g]ot the percs…No questions asked :)" to which CAO responded, "Fuck yeah!!!"  After that, V.C. texted "I'll try for your pills next week and keep you posted," and CAO replied "Sounds good brother! Happy for today's success."  Thereafter, on January 17, 2021, V.C. texted CAO to let him know that he had gotten prescription pills from a Target Pharmacy.  CAO and V.C. met up later that day in the parking lot of V.C.'s residence so V.C. could give CAO some of the narcotic medications, per their kickback arrangement.

18.    Likewise, on May 23, 2021, V.C. texted CAO "Yo I just got the script from safwway [*sic*] on gtown! Thanks for the hookup," to which CAO asked if it went smoothly.  V.C. explained that he got the pills with "no questions asked" to which CAO replied "Good! Let me know when you can get the next script."  V.C. then reminded CAO that [b]oth scripts are for percs . . . Did you want me to grab that one for u?" to which CAO replied, "Yea sir!"  One week later, on May 30, 2021, after visiting five different pharmacies in the District of Columbia, V.C. obtained additional Percocet pills using another prescription CAO wrote for V.C. That same evening- just hours before V.C. died- CAO and V.C. messaged back and forth about where to meet to hand over

CAO's portion of the Percocet that he had prescribed to V.C. Ultimately, CAO suggested that the two meet up at CAO's apartment complex to exchange the pain medications.  According to the messages, the two did meet in the parking lot CAO's apartment complex just after 8:00 p.m. on May 30, 2021, during which time V.C. provided CAO with his portion of the prescription drugs.

19.    ***CAO takes steps to avoid detection by law enforcement.***   A review of the text messages also revealed that CAO explained to V.C. specific steps he took to avoid detection by law enforcement and regulatory authorities.  For example, in a December 27, 2020, text to V.C., CAO explained "I have paper scripts from [Medical Center 1] but Virginia only takes electronic scripts now.  I can write you a script but you'd have to get it filled in DC.  I have to stay under a limit just to be safe.  [Medical Center 1] closes on Sundays and Mondays so those are the best days to get them filled.  If for some reason they say that they have to call the office, just take the script back."  Based on my training and experience, I know that pharmacies sometimes call medical offices to verify the validity of a prescription for a controlled substance, particularly if it is a paper rather than electronic prescription.  By purposely directing V.C. to attempt to fill prescriptions on days when he knew Medical Center 1 to be closed, CAO reduced the risk of the pharmacy calling Medical Center 1 about the pain pill prescriptions CAO wrote for V.C.  Similarly, CAO also tried to lower his risk of getting caught by instructing V.C. to "take the script back" from the pharmacist if the pharmacy did attempt to contact Medical Center 1.  Based on my training and experience, I know that by taking the physical prescription back from the pharmacist, this lowers the risk of the pharmacy retaining any paper trail or records regarding the attempt to fill the pain prescriptions, and thus reduces the potential risk of detection by law enforcement.

*Witness Interviews*

20.     ***Owner of Medical Center 1.***   The investigation revealed that CAO wrote the narcotic pain prescriptions for V.C. on a pad bearing the name of Medical Center 1, as well as the names of CAO and the owner of Medical Center 1 ("Individual 1").  Law enforcement interviewed Individual 1, who confirmed that CAO had worked at Medical Center 1 from in or around September 2018 until he quit in early 2020, during which time he helped to administer various cosmetic procedures.  Individual 1 stated that he had known CAO for more than a decade before offering him a job at Medical Center 1, and that CAO told him he had been kicked out of an anesthesiology residency program approximately six weeks prior to completing the program after CAO was caught diverting opioids from the hospital.

21.     Pay stubs and other business records obtained during the investigation confirmed that CAO's last paycheck from Medical Center 1 was issued on or about March 20, 2020. Individual 1 told law enforcement that he last exchanged text messages with CAO in or around June 2020, when CAO wrote, in relevant part, that he could no longer work for Medical Center 1, that Individual 1 would "understand one day," and that CAO "was sorry."  Individual 1 also confirmed that CAO had not been associated with the business since early 2020, and accordingly, had not worked for Medical Center 1 at any time during 2021.

22.     Individual 1 also confirmed that Medical Center 1 keeps medical charts for each patient, either in paper or electronic format.  A review of records from Medical Center 1 confirmed that V.C. had never been a patient at the business, and that there were no records at Medical Center 1 pertaining to V.C.  Finally, Individual 1 told law enforcement that he kept the prescription pads in a locked cabinet at Medical Center 1, however, he noted that CAO would have had access to the pads while working at the business.

11

23.     ***V.C.'s previous doctor***.  As part of the investigation, law enforcement also interviewed V.C.'s prior medical provider ("Doctor 1").  Doctor 1 stated that he treated V.C. from in or around August 2020 until in or around January 2021 in connection with a fractured shoulder. During the course of treatment, Doctor 1 developed a treatment plan that included several office visits to monitor the healing, physical therapy referrals, and repeated evaluations in connection with the use of pain medication to manage V.C.'s injury.  Doctor 1 stated that as part of the pain medication treatment plan, V.C. was ultimately weaned off the narcotic pain medications used to initially treat the injury, pursuant to the applicable standards of care.  At the time Doctor 1 finished treating V.C. in January 2021, in Doctor 1's professional medical opinion, V.C. no longer required prescription pain medication.  Throughout the time that he treated V.C., Doctor 1 wrote medical notes for each patient encounter, to include when prescribing pain medication and in connection with any refills.  With regards to documentation, Doctor 1 issued prescriptions electronically, maintained electronic medical records, and did not text with patients about narcotic refills.

24.     ***V.C.'s brother.***  Law enforcement also interviewed V.C.'s brother, a medical doctor who owned a medical center in Chantilly, Virginia, where V.C. worked as the practice manager from approximately August 2020 until V.C.'s death in May 2021.  V.C. knew CAO to be a doctor who previously performed cosmetic procedures at Medical Center 1 until he stopped working there in mid-2020 because he disliked the management and wanted to begin working for himself.  V.C.'s brother, like Individual 1, stated to law enforcement that he was aware CAO had been fired from his anesthesiology residency program for allegedly diverting opioid narcotics.  V.C.'s brother told law enforcement that he did not believe that V.C. was being treated by CAO at any point for any medical condition, much less one that would necessitate the prescribing of Schedule II narcotics

like Percocet or Norco.  On the day of V.C.'s death, V.C.'s brother spoke with V.C.'s girlfriend, who notified him that V.C. had taken Percocet prescribed by CAO the night before his death.

25.    ***V.C.'s girlfriend.***  As previously noted, V.C.'s girlfriend found V.C. cold to the touch and unresponsive on the day of V.C.'s death.  In an interview with FCPD detectives on the day of V.C.'s death, V.C.'s girlfriend stated that she saw V.C. consume Percocet before he had gone to bed.  In a later interview with the FBI, V.C.'s girlfriend also stated that she knew that V.C. had obtained Percocet pills via prescriptions written by CAO, and that V.C.'s consumption of Percocet in the weeks preceding V.C.'s death had accelerated to the point that she was concerned for V.C.'s health, even attempting to prevent V.C.'s consumption of Percocet on at least one occasion.  V.C.'s girlfriend described to law enforcement a friendship between V.C. and CAO, including an instance in which CAO came to V.C.'s home in early 2021 to watch a telecast of a sporting event.  To her knowledge, V.C. was not being treated by CAO as a patient.  V.C.'s girlfriend did not know of any other individual prescribing narcotics to V.C. other than CAO.

### Review of Prescription Records and Licensing Information

26.    A review of relevant prescription drug monitoring data for CAO revealed that from January 2021 through May 2021, V.C. filled approximately five paper prescriptions for Schedule II controlled substances written by CAO.   Law enforcement obtained copies of these original paper prescriptions, which were dated January 9, January 16, March 21, May 15, and May 22 of 2021.  This included the above-detailed oxycodone-acetaminophen prescriptions written by CAO that were filled for V.C. on May 23, 2021, and May 30, 2021, at pharmacies in the District of Columbia.  In addition, V.C. filled two oxycodone-acetaminophen prescriptions at two different pharmacies in Virginia on January 10, 2021 and March 21, 2021, as well as a hydrocodone-acetaminophen prescription at a third pharmacy in Virginia on January 17, 2021.  In total, during

the relevant period V.C. obtained approximately 138 pills via prescriptions for controlled substances that CAO wrote for him.

27.     Each prescription was written and signed by CAO on a pad bearing the name of Medical Center 1, even though, as detailed above, CAO did not work at Medical Center 1 at any point from December 2020 through May 2021.  Moreover, Individual 1, who owns Medical Center 1, told law enforcement that Medical Center 1 did not typically give prescription narcotics to patients receiving cosmetic treatments.  Individual 1 estimated that he himself had written a total of approximately three prescriptions for narcotic painkillers in the prior three years.

## **CONCLUSION**

28.     Based on the foregoing evidence, and based on my training and experience, I respectfully submit that there is probable cause to believe that in or around at least January 9, 2021, and continuing through in or around May 30, 2021, including on or about May 23, 2021, CAO committed violations of the laws of the United States, that is, unlawful distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Date: September 13, 2021                  Respectfully submitted,

_____
JESSE A. DODSON, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

*Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 13th day of September, 2021.*

_____
HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE